KIRBY LUMBER CO. v. HARDY.
(No. 180.)

(Court of Civil Appeals of Texas. Beaumont.
May 23, 1917. Rehearing Denied
June 13, 1917.)

1. MASTER AND SERVANT ☞203(1) — INJURY TO SERVANT — DEFENSES — ASSUMPTION OF RISK.

Before the enactment of the Workmen's Compensation Act (Acts 33d Leg. c. 179 [Vernon's Sayles' Ann. Civ. St. 1914, arts. 5246h–5246zzzz]), if an employé's injury proximately resulted from a risk or risks of dangers ordinarily incident to his employment, of which he knew and was apprised, or in the exercise of ordinary care necessarily must have known or have been apprised at the time of his injury, or from a risk or risks of dangers which were open, patent, and obvious to him, or such as grew out of the operation of the simplest laws of nature, or which were equally as open and apparent to him at the time of his injury as they were to the employer, the employé assumed such risks and was not entitled to recover.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 538–540, 542.]

2. APPEAL AND ERROR ☞1003 — REVIEW — EVIDENCE.

In an employé's action for injuries sustained before the enactment of the Workmen's Compensation Act, where all phases of assumed risk were specifically interposed as a defense, it only remains for the appellate court to determine whether the evidence bearing upon the defense was such that it could be said that it was practically without conflict, and that reasonable minds could not arrive at different conclusions thereon.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3938–3943.]

3. MASTER AND SERVANT ☞280—INJURY TO SERVANT—DEFENSES—ASSUMPTION OF RISK.

In an employé's action for injuries sustained while working as a grab setter, when a log was thrown against him by a "bunching team" which had been attached to it to assist in pulling it

up a hill, where it appeared that plaintiff was a man of mature years and discretion, that he was accustomed to various kinds of manual labor, that he was familiar with many phases of sawmill work, had owned a sawmill, and was familiar with the driving and handling of teams, although he was inexperienced as a grab setter, and that plaintiff saw and observed the manner in which the team was hitched to the log before he was injured, and saw and fully realized that the team would probably pull at an angle from the cart team also attached to the log, and that if it did so the log would be caused to swing in the direction of plaintiff, and if so he would be in danger of being struck and injured, evidence *held* to show that he assumed the risk.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 981–986.]

4. MASTER AND SERVANT ☞154(1), 222(2) — INJURIES TO SERVANT—ASSUMPTION OF RISK —PRESENCE OF VICE PRINCIPAL.

Although where a master or vice principal is present and orders an employé to perform a dangerous act, and the employé on the spur of the moment performs such act without realizing its dangers and is injured, the master may be deprived of the defense of assumption of risk, where a grab setter was aware of the danger attendant upon his attempt to chock a wheel of a wagon used to drag logs in obedience to an order of the foreman, there was no necessity for a warning by the foreman, and the presence of the latter acting as vice principal did not deprive the employer of the defense of assumption of risk.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 308, 649.]

5. MASTER AND SERVANT ☞154(1)—INJURY TO SERVANT—DUTY OF MASTER TO WARN.

Although a master must not only warn a minor that an occupation is attended with danger, but must explain to the minor the nature of the danger and how to avoid it, where the employé is an adult, the master, where such danger is not understood or appreciated by the employé, is only required to warn him of the danger attendant upon the occupation, but is not required to explain the details of the danger, or how to avoid it, where it is such as to be readily understood and appreciated by the employé, and in neither instance will the master be held liable where the danger of the employment is known to and appreciated by the employé.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 308.]

6. APPEAL AND ERROR ☞1175(3) — DISPOSITION OF CAUSE.

In an employé's action for injuries, where it appears that the case was fully developed in the trial court, and that there was no reasonable probability apparent from the record that the plaintiff could make out a case of liability against the defendant on another trial, it becomes the duty of the appellate court to reverse judgment for plaintiff and render judgment for defendant.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 4577.]

Appeal from District Court, Jasper County; A. E. Davis, Judge.

Action by W. A. Hardy against the Kirby Lumber Company. From judgment for plaintiff, and from overruling of motion for new trial, defendant appeals. Reversed and rendered.

Andrews, Streetman, Burns & Logue, of Houston, for appellant. Powell & Huffman, of Jasper, for appellee.

---

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

HIGHTOWER, C. J. The court adopts the following statement of the nature of this case, as made by appellant herein, and which is admitted by appellee to be substantially correct: This suit was brought in the district court of Jasper county, Tex., by W. A. Hardy, as plaintiff, and who is appellee here, against the Kirby Lumber Company, defendant, and who is appellant here, to recover damages for personal injuries alleged to have been sustained by appellee while in the employ of appellant on or about the 18th day of November, 1912. This is the second appeal of the case, the opinion upon the former appeal being reported in 183 S. W. 80. The cause was tried with a jury, and was submitted upon special issues. Upon the answers of the jury to the special issues, judgment was entered in favor of appellee against appellant for the sum of $5,000, with legal interest. Appellant thereafter filed its motion for new trial in due time, and the same was overruled, and judgment is now before this court for review.

Appellee for cause of action alleged substantially: (a) That he was employed by appellant as a grab setter in the woods; that one Tom Sheffield was his foreman; that on or about the 18th day of November, 1912, appellant through its employés, was attempting to move from the woods to the tramway a large log, by means of a log cart drawn by four mules; that the team was unable to pull the log, and said foreman, Sheffield, thereupon assumed the control and management of moving it, and directed that a bunching team, consisting of two mules, be hitched onto the front of the log, for the purpose of assisting the cart team in pulling it; that appellee was directed and ordered to "chock" or "scotch" the wheels of the cart; that, while appellee was engaged in so doing, the teams hitched to the cart and the log were both caused to start and pull, by the direction of said foreman; and that the bunching team was hitched in such manner to the log and pulled in such manner on the log that the log was pulled and jerked crosswise, and abruptly thrown over and against appellee, catching his right leg between the log and a stump, and causing his injuries.

The claims of negligence on the part of appellant, relied upon by the appellee, were alleged, substantially, as follows: (1) That appellant negligently and carelessly hitched the bunching team to the front end of the log, instead of to the cart, in front of the cart team. (2) That appellant did negligently and carelessly, under the circumstances, fail to place a check line on the bunching team, to prevent it from pulling crosswise. (3) That appellee was inexperienced in the work he was doing, and that the defendant was guilty of negligence in requiring him to work in the dangerous and unsafe place where he was, without warning him of the dangers.

Appellant, after demurring generally to appellee's petition, and denying the allegations thereof, set up, substantially: (1) That the hitching of the bunching team to the front end of the log, as was done upon the occasion in question, was the proper, usual, and customary way, and an efficient, effective and practical manner of doing the work in question, and therein appellant was not negligent. (2) That appellant was not negligent in failing to place a check line on the bunching team, for that, in the first place, there was no check line available, and, in the second place, it was not proper, customary, or usual to place any check line on the bunching team. (3) That appellant was not negligent in requiring appellee to work in a dangerous place, without warning him of the danger, for that: First, the appellee voluntarily and of his own accord selected whatever place he was working in on the occasion in question; and, second, no notice or warning to appellee of the dangers of the position in which he placed himself was necessary, for the reason that he was a man of mature years, experienced in that character of work, which would necessarily acquaint him with the dangers of his position, and then and there knew and was apprised of the dangers of such position, which were open, obvious, and apparent to any one, and which grew out of the operation of the ordinary laws of nature. (4) That the risk of danger or injury from the log under the circumstances was assumed by appellee, for the reason that appellee then and there knew that the bunching team was hitched to the front end of the log, and was fully acquainted with all of the surroundings, and knew that the bunching team was hitched to the log at an angle, and that, when it pulled on the log, the log would be caused to turn or swing towards the left of the cart wheel, where plaintiff was, and knew the risks and dangers of the position in which he placed himself, so far as injury to him from the log was concerned, and the risk and danger of the log coming in contact with him and injuring him were open, apparent, and visible to any one, and especially to one of mature years, as was plaintiff, and such risks and dangers grew out of the operation of the ordinary laws of nature, and were in all things assumed by appellee. (5) That in failing to keep himself out of the way of the log, so as to avoid injury from the log coming in contact with him while being moved, appellee was guilty of negligence, which contributed to his injury. (6) That, if the appellee's injury resulted from the bunching team pulling crosswise, such was no fault of appellant, but the fault of appellee's fellow servant, one Green Smith, the driver of the bunching team, who by the exercise of ordinary care could have controlled the bunching team and kept it alongside of the cart team, by the use of driving lines then and there provided, and that appellee's injuries therefore resulted from the negligence of his said fellow servant.

It might be here stated that the following

facts were shown, practically without dispute:

Appellee was employed by appellant as a grab setter. His place of work was in the woods, where the logs which had been cut were being carried or dragged by means of log carts to the tramroad for loading on the cars and transportation to the mills. These log carts are of skeleton construction consisting mainly of two wheels and axle, a slip tongue with a lever, and a set of grabs or hooks. The wheels are about eight feet in diameter. Between the wheels or the length of the axle is about six feet. The grabs, or hooks, hang midway between the wheels. The slip tongue controls the grabs. When the tongue is slipped back of the groove in which it works, the grabs are let down to the log, and, when the tongue is pulled forward, the grabs are raised. In order to move a log, the log is straddled by the wheels, and the grabs are then let down and hooked by the grab setter near the center, but slightly towards the front or team end of the log. The team is then started forward, and, while the cart wheels remain stationary, the log, by means of the slip tongue, is raised from the ground, and suspended under the axle, nearly balanced, with the back end touching the ground, and the front, or team, end clear of the ground.

On the occasion of the accident, which occurred about 5 o'clock in the afternoon, the cart team, consisting of four mules, driven by one Willie Stimits, was pulling a log cart and a log about 24 inches in diameter up an incline, when it became stalled. The woods foreman, Sheffield, coming up and finding the team stalled, proceeded to direct the work of getting the log up the hill. He, himself, put a "chock" or "scotch" under the right-hand wheel, and directed appellee to put one under the left-hand wheel. The cart team was caused to pull alternately to the right and left, and, when it would move the right wheel, Sheffield would move his chock up, and, when it would move the left wheel, appellee would move up his chock. The process resulted in a considerable hole being worked in the ground by the alternate movement from right to left of the wheels, and the cart team was unable to get the log up the hill. The team was then backed, slipping the tongue backwards, and letting the log to the ground, and with the log on the ground, and released from the cart, the cart was moved, or jumped, from out of the hole. The cart team then pulled the tongue forward, and again raised the front end of the log from the ground, suspending the log under the axle and between the wheels. Sheffield, in the meantime, directed the driver, Green Smith, of a bunching team, consisting of two mules, to hitch his team onto the front end of the log. The bunching team was equipped with singletrees, a doubletree, a chain attached to the doubletree, and a pair of tongs or grabs

attached to the fittings; his team being used to bunch the logs together in the woods. The bunching team was brought up to the right-hand side of the cart mules, and hitched onto the log, by fastening the tongs to the front end of the log; the front of the log being at an angle to the left of the bunching team. When this was done, and the teams pulled forward, the back end of the log was caused to swing around towards the left-hand cart wheel.

Appellee's claim was that, just beside the left-hand wheel of the cart, there was a tree top, but for which he would have gotten out of the way to the side of the wheel to chock it, and that on account of the presence of said tree top he had to crowd in between the same and the log in order to chock the wheel; that, before the bunching team pulled on the log, he had gotten from behind the wheel and had come back behind the back end of the log, but that, about the time the teams were ordered to pull, Sheffield halloaed at him to take up as much of his chock as he could, and that he thereupon went between the log and tree top for the purpose of chocking the wheel, when the log, by reason of the teams pulling, swung over towards the left-hand wheel, and caught his leg between the wheel and a stump, breaking his leg.

The log that was being handled at the time was an extra large log, some 33 inches in diameter, and 24 feet long, and when the foreman, Sheffield, came up to the team, which was handling said log, he ordered appellee, who was the grab setter for this and one other team, to assist him (Sheffield) in setting the grabs on this log, which appellee did. There was testimony introduced by appellee sufficient to show that, in going from the back end of the log to the left wheel of the cart, appellee had to pass between a stump and the log, and that after the teams were hitched onto the log, as hereinbefore shown, and had commenced to pull, the log swung around and caught appellee's leg between the log and said stump, breaking his leg.

There is a photographic copy in the record showing the construction of the log cart, together with the team hitched to it, as nearly as could be ascertained, at the time appellee was injured; but we deem it unnecessary to incorporate the photograph in this opinion, as we think the whole situation, as it existed at the time, to have been readily understood from what we have said.

The case was submitted to the jury upon 31 special issues. The answers of the jury to these issues reflect, with reasonable clearness, the issues themselves, and such answers were substantially as follows:

(1) That appellee was inexperienced in the work he was engaged in at the time he was injured.

(2) That the foreman, Sheffield, knew that appellee was inexperienced in the work he

was engaged in at the time he was injured.

(3) That Sheffield ordered appellee to chock the wheel at the time he was injured.

(4) That Sheffield knew, or by the exercise of ordinary care could have known, that it was dangerous for appellee to undertake to chock said wheel at the time he was ordered to do so.

(5) That appellee did not know, at the time he attempted to chock the wheel, that he was in danger of being injured by the log.

(6) That appellant was negligent, under the circumstances, in failing to place a check line on the bunching team.

(7) That, if a check line had been placed on the bunching team, it could not have pulled at right angles or crosswise with the cart team.

(8) That appellee was injured by reason of the bunching team pulling crosswise to or at right angles with the cart team.

(9) That $5,000, if paid now, will compensate the appellee for the injury sustained by him.

(10) That the bunching team, upon the occasion in question, was hitched to the log after the cart was last jumped out of the hole.

(11) That the bunching team, upon the occasion in question, was hitched to the log after the log was "loaded out."

(12) That appellee chocked the left-hand wheel of the cart after the cart had been jumped out of the hole, and the log had been loaded out.

(13) That appellee, when he so chocked said wheel, stood to the rear of the wheel to do so.

(14) That appellee could not have stood to the side of the wheel to chock it.

(15) That appellee would have stood to the side of the wheel to chock it, if he could have done so.

(16) That appellee would have stood at the side of the wheel to chock it if he could have done so, because he knew there would be less danger to him of injury from movements of the log.

(17) That appellee, after he chocked the left-hand wheel of the cart, after the cart had been jumped out of the hole, then went back beyond the back end of the log.

(18) That appellee, when he so went back beyond the back end of the log, did not do so because he knew it was dangerous for him to remain where he had chocked the wheel.

(19) That appellee so went back beyond the back end of the log because he was through with his duties in connection with his grabs.

(20) That, at the time the bunching team was hitched onto the end of the log, appellee was standing at the back end of the log, waiting for orders.

(21) That appellee saw the bunching team while it was being hitched onto the end of the log.

(22) That appellee did not know that, when the bunching team pulled on the log, the log would be caused to turn or swing towards the left-hand cart wheel.

(23) That appellee knew that there was danger of injury to him from movements of the log, unless he remained out of the way of the log.

(24) That, after the bunching team had been hitched onto the log, Sheffield, the foreman, at or about the time the team started up, directed appellee, in substance, to take up as much with his chock as he could, or catch all he could.

(25) That after the bunching team had been hitched onto the log, and at or about the time the team started to pull the log, appellee went up behind the left-hand cart wheel to take up the chock, or catch up the chock.

(26) That appellee did not or would not have gone in there behind the wheel to take up or catch up the chock but for the direction of said foreman, Sheffield.

(27) That appellee would not have gone in behind the wheel to take up or catch up the chock but for the direction of said Sheffield, because he had no orders.

(28) That appellee did not know the place in which he had to put himself to take up or catch up the chock, after the bunching team had been hitched on, was a dangerous place.

(29) That the bunching team, when they first pulled on the log in question, pulled out at right angles to the cart team.

(30) That the driver of the bunching team, on the occasion in question, by the exercise of ordinary care could not have kept the bunching team pulling alongside of the cart team.

(31) That if the driver of the bunching team, upon the occasion in question, had caused his team to pull alongside of the cart team, appellee would not have been injured.

Appellant's first assignment of error challenges the action of the trial court in refusing to give to the jury appellant's special charge No. 1, which was a peremptory instruction in favor of defendant.

It is claimed by appellant that such peremptory instruction in its favor should have been given, because the undisputed evidence, when carefully analyzed and given effect, shows that appellee's injury was the result of risk or danger assumed by him, and that therefore appellant was not liable to appellee in any sum for damages in consequence of such injury. There are a number of propositions under this assignment, in different form, but all relating to this one proposition of law. It will be remembered that this injury here complained of by appellee occurred prior to the enactment of what is known as the Workmen's Compensation Act, or Employers' Liability Act and therefore that legislation cannot control in any way the decision on this point contended for by appellant; but the law of assumed risk, as applicable to

cases of this kind, prior to this recent legislation, must control.

At the outset, we will state what we understand to be the principles of law relative to the defense of assumed risk in cases of this kind, as the same existed prior to the enactment of the Workmen's Compensation Act, above referred to, and as such principles should be applied here.

[1, 2] If appellee's injury proximately resulted from a risk or risks of dangers ordinarily incident to the employment in which he was engaged at the time he was injured, or from a risk or risks of dangers of which he knew and was apprised, or, in the exercise of ordinary care, necessarily must have known of and been apprised at the time of his injury, or from a risk or risks of dangers which were open, patent, and obvious to him, or such as grew out of the operation of the simplest laws of nature, or from a risk or risks of dangers which were equally as open and apparent to him, at the time of his injury, as they were to appellant, then appellee was not entitled to recover in this cause. All of these phases of assumed risk were specifically interposed as a defense by appellant on the trial below, and it only remains for this court to determine whether the evidence bearing upon the appellant's defense of assumed risk was such that it can be said that the evidence was practically without conflict, and that reasonable minds could not arrive at different conclusions thereon. It therefore becomes necessary, in disposing of this assignment, to set out at some length the testimony bearing on this point; and since the testimony of appellee himself, as reflected by the record before us, is, in our judgment, the most important testimony in the record bearing on this assignment, and, in fact, is in our judgment practically conclusive, we set it out, practically in full:

"My name is W. A. Hardy, and I am the plaintiff in this case. Let me see if I can tell you how old I am. I am somewhere between 57 and 60, somewhere right about that. I don't know my age just exactly. I have worked for the Kirby Lumber Company. The last time I worked for them was 4 years ago the 18th day of this coming November. I was at work for them at that time on what they call the Browndel Front, south of Browndel, 7 or 8 miles. I received some injuries while I was working for the Kirby Lumber Company. I received them on the 18th day of November, 1912. I was working that day out this side of Browndel, 7 or 8 miles, on the tramroad. I was getting $1.50 a day at that time as wages. I was setting grabs that day for the cartmen. The Kirby Lumber Company cuts logs and saws lumber; that is all I ever knew them to do. It has a sawmill and manufactures lumber. It carries its logs in on the cars, hauls them. It gets them to the tramroad with mule carts; that is, carts drawn by mules. On the day I was injured, I was setting grabs for the Kirby Lumber Company—fastening the grabs to the logs they were hauling. Mr. Stimits was driving one of the teams that I was setting grabs for, and a man named Bullock (I think his name was, as well as I recollect) was driving the other one. I was setting grabs for two teams. I was hurt by the team that Mr. Stimits was driving. I will tell

the jury as straight as I can talk how came me to get injured. I was setting grabs during that day, and late in the afternoon we had come to a big log. It was a good large log, and, while we were standing there, Mr. Sheffield, the foreman, came up, and he says, 'Here boys, let's back your cart onto this log.' He was speaking to Mr. Stimits. He says, 'Back your cart onto this log here,' and he backed his cart onto it. He always called me Uncle Bill. He says, 'Uncle Bill, let's set the grabs on this big log.' The grabs wouldn't take it. The grabs turned like my finger. I bore down on one of the grabs on one side, and Mr. Sheffield on the other until it fastened them. Then they tried to go with it and they couldn't go, and he says to me, 'You get a knot and put behind that wheel there,' and pointed at the wheel, which was the left wheel of the cart, and he gets one and goes to the other wheel. When they pulled around that way, I moved up my knot; and, when they pulled the other way, he moved up his knot. We done that until we went about 10 steps, and they failed to go any further. They got into a kind of a jamb in a tree top. The cart was jambed into a tree top. He says, 'You keep your knot under that wheel there,' and he called to the fellow to bring the bunching team around, and he fastened the bunching team to the front end of the log, and he got a whip and whipped the mules around a right smart. He made several trials, and they didn't make a move. Toreckily they got started all at once, and when they moved he halloos to me to catch all I could with my knot behind the wheel. There wasn't room for me to get side of the wheel on account of this tree top. I had to get behind the wheel. It was the only way to get there. Just as I stopped like this (indicating) to catch hold of my knot to move it up, the back end of the log was jerked around on me. The bunching team swung around yonder to one side, and the end of the log fastened my leg against the stump and broke it. I wheeled around like this (indicating) and tumbled down; it was just luck that I fell out of the way. That is as near as I can tell you. I will have to get off my shoe to show you where it broke my leg. Here (indicating) is where it was broken. The end of the bone sticks out right there (indicating). It was broken just above the ankle. It is broken in one place. That is all that I ever claimed there was. Grimes said, I think that it was broken in two places; afterwards he said it was broken in only one place.

"Tom Sheffield was the Kirby Lumber Company's foreman—team boss. It was his duty to hire hands and discharge hands, and to see that the logs got to the tramroad. It was his duty to get the logs out of the woods to the tramroad. Tom Sheffield hired me. He is the man that told me to get the knot and put it behind the wheel. He was the team boss. He had the management and control of the teams in getting the logs from the woods to the tramway. Tom Sheffield employed the hands in that department of the work. He employed the teamsters and grabsetters. He had charge of hiring and discharging the teamsters and grabsetters and skidway men, and such like as that. He attended to that; that was his business. It was the teamster's job to haul the logs. Mr. Tom Sheffield kept my time. Mr. Sheffield had the control and management of moving that log at the time I was hurt; we were all working to his orders. Tom Sheffield is the one that ordered Green Smith to come there with the bunching team. I didn't get to the side of the wheel and chock it because I couldn't get there. There was a tree top there so I couldn't get by the side of it. I was at the only place that I could get to do that work. I said I was hired as a grab setter. My real duty that day was to set grabs. I had been a carpenter up until that day, with the exception of one day before; one day before I had set grabs a part of a day. I had set grabs a part of a day before that, and that day

was all. That is the only experience I ever had in grabsetting. Q. Did Mr. Sheffield know that you were not an experienced grabsetter? A. Yes, sir.

"When Mr. Sheffield employed me that morning to set grabs, I told him I never had set any grabs, except just a piece of a day before that, and he said I could learn. It was just a few minutes before 5 o'clock that I was injured. We quit work in the woods at that time of year at 5 o'clock in the evening. I think he pulled out his watch and remarked, 'We just have got 15 minutes to get this log out of here.' I was employed as a grab setter, but I was chocking that wheel under the direction of Mr. Tom Sheffield. When the log was standing there and the team was backed, hadn't pulled it, the team was facing west. There was a hill in front of that team. There were no obstructions or tree tops or logs or anything in front of the team. Q. Where would have been the proper place to have hitched that bunching team to move that log? * * *

"I have driven freight wagons. I have driven oxen. I suppose that that bunching team could have been hitched in front of Stimits' team that was hitched to the log cart. There was a chain on the wagon during the day, and I asked what that chain was there for, and they said it was to hitch the bunching team in front. The chain fell off, and I put it back on the cart and asked what it was for, and they said it was to hitch the bunching team in front of the other team. There was nothing in the way to prevent hitching that bunching team in front of that team that was hitched to the log cart. The people that were there when I was hurt were Tom Sheffield, Green Smith, Will Stimits, and a fellow who was a stranger to me—Bullock. They were all the parties that were right there. The log cart and the log and team that I was chocking the wheel for went onto the skidway when they got started. It was about a hundred yards, about a hundred steps, from there to the skidway. I couldn't tell you to save my life whether they stopped between there and the skidway or not. After I got hurt, I never noticed. Tom Sheffield was the first one to me after I was hurt. After they got off to the skidway, he came back down there. He said, 'Uncle Bill, what is the matter?' I said, 'It looks to me like it is broke.' He came and looked at it, and said, 'Damned if it ain't.' After my leg was broken, they carried me up to the tramroad, to the skidway, and laid me down on the ground there, and then took me from there to Browndel. Three or four men packed me from where my leg was broken up to the tramway. They carried me from there to Browndel in a car. They carried me to the doctor's office and done up my leg, and then carried me to the hotel, and put me in the hotel in a room. Dr. Grimes and Dr. Sellman, or some such name as that, did up my leg. Then they carried me to the hotel, Browndel hotel, or boarding house, whatever you call it. I remained there four days. I was hurt on Monday evening. I stayed there Tuesday, Wednesday, Thursday, and Friday. I stayed there four days. * * * It seems to me that on the fourth evening (I am not positive) they carried me home. * * * I was 40 days and nights in the bed with that leg. * * * No man could suffer, with a broken leg, it don't seem to me like, more than I did during that 40 days. * * * The first time I was out, they helped me out and put me in the buggy. That was about 42 days after I was crippled, 2 days after I got to where I was able to turn over. * * * It was something like a year before I could lay down my crutches. As to how long it was after I got hurt before I could do any work at all to make a living, will say, it is sorter owing to what kind of work I could do. I could stand and chop with an axe about 18 months after that, and chop stove wood. As to how much time I actually lost from the time I was hurt until I could do anything, will say, I never done anything for nearly two years. I didn't do anything because I wasn't able. I couldn't walk. * * * I am not able to do manual labor now. * * * I am not able to plow. I am not a professional man. I was raised on a farm. I was raised on a farm, and I am a laboring man.

"I had never seen a bunching team hitched to the front end of a log before. That was the first one. The log was thrown over against me by the hitching of the team to the front end of the log, by letting the team fly around to the right, and jerking the back end of the log on me. Q. If that team had pulled straight while hitched there, would that log have hit you? A. Why it don't seem to me that it would, if they had pulled straight. There was no danger at all, that I could see, in my duties while chocking that wheel before that bunching team was hitched to the log. Q. The place where you were required to work to chock that wheel, and while you were chocking it before the bunching team was hitched to the log, was perfectly safe, was it not? A. During the time I was working there and chocking this wheel before this bunching team was hitched to the log, I did not observe anything that would cause me to think there was any danger in my work. I didn't observe it, because I didn't see any danger. Mr. Sheffield hadn't told me to look out, there was danger. As a matter of fact, there is no danger in chocking a wheel when there is nothing but the main team hitched to the cart. I would be bound to say there was none; Mr. Sheffield hadn't told me anything about danger. No one advised me or told me to look out, it was dangerous, after the bunching team was hitched to the front end of the log. I did not know or see any danger at that time. Q. Now, Mr. Hardy, I will ask you if that bunching team had been hitched in front of the main team, and make what we call a spike team, would that log have been thrown against you? A. No, sir; I have hitched a many a team to other teams.

"My father is living. My mother is also living. One is 85 years old, and the other is 86. My father's and mother's health conditions are about ordinary with such men and women of their age. Lines like you drive a pair of mules to a wagon with were on these mules that were hitched to the end of the log—the bunching team. Driving lines were on them. I have seen check lines, and I know what is called a check line. Q. What would have been the effect if there had been a check line on these mules with reference to pulling around to the right? A. They couldn't have pulled to the right if there had been a check line on them. I could do a good square day's work before I got crippled, and now I can't do anything hardly at all. I say that I am not able to do manual labor now—hard labor. I can cut stove wood, fire wood, and get in my buggy and ride about peddling, something like that. * * * I said that I don't know how old I am. The record of my age got burned up. I know something near my age. I was born in 1854, I think. My mother says, as well as she recollects, her mind teaches her I was born on the 16th day of September, 1854. That makes me 62 years old. That is what she says about it, and that is all I can go by. I was asking her Christmas, when I was there, if she knew just how old I was, and she said as well as she could recollect I was born on the 16th day of September, 1854. That was this past Christmas. I had known before that time the year in which I was born. When we wanted to know, we would go to the Bible and find out; but the Bible got burned up that our ages were in. I don't know how long it has been since that Bible burned up. I have been away from Pa's 36 years. I don't know what time it was destroyed. In recent years I have known right about the time when I was born; I have known what my mother told me about it. I talked to my mother about it before last Christ-

mas, and I had kind of forgotten, and I asked her again, and she said it was the 16th day of September, 1854. It was last Christmas that I asked her. I hadn't seen her for about a year before that. I didn't ask her about it at that time because I was crippled then so bad with my leg that I never thought of asking her anything like that that I remember of.

"Q. Now, Mr. Hardy, just before you went to work for the Kirby Lumber Company setting grabs, what kind of work had you been doing? A.. Let me see what I had been doing just before I went to work for the Kirby Lumber Company. Q. Before you went to work setting grabs? A. I had been farming. I did some work for the Kirby Lumber Company before I went to setting grabs. I built two or three corrals for them, two, and I worked on the tram-road some. I used a shovel on the tramroad, grading I mean. I never drove any team. I used a shovel. As to what other work I did for the Kirby Lumber Company outside of handling this shovel on the tramroad and building two corrals, will say, why, I set grabs. There was not any other work that I did for the Kirby Lumber Company except that. I did not farm any between the time I built these corrals and the time I went to setting grabs. I. farmed before that: I built one corral, and the day I finished the corral Mr. Sheffield came to me and told me he wanted me to set grabs, and I says—As to how long all together I was working for the Kirby Lumber Company building those corrals and working on the right of way, will say, I went to work for them on the 20th day of August, and I was hurt in November. I worked all of September and October. I worked all the time, every day. Before I·went to work for the Kirby Lumber Company, I was farming. I was farming on my place up here in Jasper county. I had about 35 acres there. Right on that very place, I had been farming just that year. Before I went to that place where I farmed that year, I was farming in Newton county. Before I went to this place in Newton county, I had leased a little sawmill and run that. I had leased a sawmill and I was operating the sawmill. I was running the carriage. It was a little water sawmill, and I ran the carriage. I operated that sawmill something like a year; I don't remember. That sawmill was located five miles east of here. I bought the logs that I used in that sawmill from a negro out there. I hired a negro to haul them in with a wagon. He loaded them on a wagon and hauled them. I did not help in that work. I did not go out and supervise the loading of those logs on the wagon and hauling them in. I would not help with the logs after they got them to the mill. I had a negro to roll them in on the skidway and on the carriage, and I would run the carriage. I ran the carriage; I didn't run the logs. The negro handled the logs, rolled them up there with a cant hook. I hardly ever helped do that. I was there where the logs were being brought up all the time. I had to operate the carriage. I did that about a year. Before that time, I farmed. From the time I was big enough to go to the field, which was in about 1865, Pa put me in the farm, and I farmed from that time until I took hold of that little sawmill. I worked on my father's farm. He had something like 25 or 30 acres in cultivation. As to whether or not I stayed there on that farm and worked on that farm until the time when I leased this little sawmill, will say, I wasn't there quite all the time; of course, I was out part of the time, but I was supposed to be there nearly all the time. As to how long a time I was out, will say, sometimes I went to school awhile and sometimes I drove my father's wagon around and hauled freight. I hauled freight from here to Wiess-Bluff. I was hauling freight for Bendy and White and Norsworthy. I was not working for wages. I was working for Pa, working for my father. That was the only kind of work I did. One year I stayed in Brookeland up here, and I didn't do much of anything. * * *

"Q. Now, isn't it a fact that for awhile you hauled logs? A. Hauled logs? Q. Yes, sir. A. Let's see the amount of logs I hauled.· I will tell you all about it. I was going to tell you how I hauled them. I have hauled a load or two of logs in my life. I have hauled a load or two, as far as I recollect. If I testified on the other trial of this case that I spent 8 or 10 days of my time hauling logs on a log car, I don't remember it. Let me study and see if I hauled logs anywhere that I can remember. I hauled logs a part of ·a day. I set grabs a part of a day, and I changed off with a grab setter, as he saw that I couldn't set grabs just right, and I hauled two loads of logs that day. I set in the saddle and drove the mules. If I ever hauled a log beyond that, I don't remember it. As to whether or not I testified on the other trial that I drove four yoke of oxen to a log cart and spent 8 or 10 days of my time hauling logs on a log cart, will say, it has been a long time since I have hauled with oxen. Let me see if I ever hauled logs with an ox team. I did; yes, sir. I hauled logs at Cairo. I hauled logs at Cairo a short time, just a few days. It was in 1880 or 1881 that I hauled those logs, and it has been so long that I have forgotten how long I hauled. It might have been a week that I hauled logs. I have worked around logging camps a little bit. I rafted logs and a few ties at a logging camp. A negro hauled those logs that I was rafting out of the woods. I rafted them on the river. They rolled the logs in with cant hooks. I made some pens and bored some holes and drove the pens through into the logs. As to whether or not for a short while while I was with the Kirby Lumber Company I drove a team to a log cart, will say, I hauled two loads of logs. I have helped build log carts. I can't recollect the shop man's name that I helped. I only helped at it a short time. As to whether or not I ever built any wagons, will say I built two or three wheels. An uncle of mine was a carpenter, and I worked in the shop with him awhile. I helped an uncle of mine build wagons. I have driven teams of various kinds. I have driven ox teams. I have driven four mules and hauled two loads of logs. I have driven two horses to a wagon. I have also driven horses to a buggy. I have driven one horse to a buggy. I never did drive a double team to a buggy. I have driven horses and mules to plows. I have not lived right in the pine woods all of my life. I don't remember how many years I have spent in the piney woods. I have spent something like about four years of my life right in the piney woods, I think. I have been right here in East Texas all of my life except about three years. I have been away from here about three years. I was farming in Western Texas during those three years. I say Western Texas; it was out here in Middle Texas. I stayed in Limestone county a part of three years. I was farming. I have cleared ground. I never did drag any logs off of the cleared ground. We gave log rollings and rolled them up in piles and burned them. I have been to log rollings. I have seen logs rolled, and I have rolled them myself. I·have rolled them, and toted them too.

"On the occasion of this accident, the team didn't balk with that log before Mr. Sheffield got there. The team wasn't hitched to it before Mr. Sheffield· got there. As to whether or not the grabs were hooked in the log after Mr. Sheffield got there, will say, after Mr. Sheffield got there he had the driver of the cart team to back the cart across that log. That log was about 33 inches across the stump and 24 feet long, as I remember it. As to how big in diameter it was at the little end, will say, the log was gone and I couldn't measure it at the little end. Q. Didn't you afterwards go back and measure the top that was left there? A. Yes, I measured the stump. Q. Didn't you after-

wards go back and measure the top that had been cut off the tree, at the little end? A. It was 48 feet. The butt piece was the one that we had, and I could only measure 48 feet. I could measure the top up, you know, 48 feet. We didn't have that log. We had the butt log. I couldn't measure it.

"This log was 33 inches at the stump, and it was 24 feet long. As to whether or not there was another 24 feet in between where that one was cut off and the top that was there, will say, it was 24 feet from the end of this log to the top that was there. I believe I did go back and measure the place where that tree had been cut off, where the top had been cut off; but I couldn't tell you the size of it now to save my life. I don't remember whether or not I testified on the last trial that it was 24 inches. Anyway, it was 33 inches at the stump, and it was 24 feet long. I said that Mr. Sheffield helped me to put the grabs in that log. I couldn't take two grabs; he took one of these grabs and me the other one, and he bore down on one of them and me the other. They set out like that, and he held down on one and me the other. The log was lying flat on the ground when we fastened the grabs on it. What we mean by loading the log out is that we cause the cart team to go forward and slip the tongue. You make the cart team go forward, and in going forward they pull on a lever that raises the log from the ground and suspends it under the cart, and when they loaded this log out, that is, when they got the cart team to pull up and pull on the lever so as to raise the log from the ground, they never moved the cart, they were just pulling the log up. This operation is done through the instrumentality of a slip tongue, which they just simply pulled and slipped forward so as to raise the log from the ground. The back end of the log was touching the ground, and the front end was clear of the ground just a little bit. After the log was loaded out, Mr. Sheffield told me to chock the left-hand wheel, and he chocked the right-hand wheel. Then the cart team would turn to the left and pull the cart over to the left and then to the right and to the left again, trying to go forward with the log, and, as the cart team would pull to the right and turn the cart to the right, I would go up and put the chock under the left-hand wheel. When they would pull to the left, Mr. Sheffield would chock the right-hand wheel. Then when the cart team would pull from side to side, or when it would pull around to the right, it would pull the right-hand wheel back against the log, and, when it pulled to the left, the left-hand wheel back against the log. I could see that. As to whether or not a fellow at that time, standing in there between that wheel and the log, might get hurt while that process was going on, will say, if he got in between the cart wheel and the log, of course, he would. During the process of turning that cart to the right and to the left, the wheel would hit one side or the other of the log if it turned far enough, and it probably turned far enough right there on that occasion to do that. It would be a hard question to get a man in between the log and the cart wheel; he could see that there was danger, and he wouldn't get there. If the cart team pulled the cart around to the right, I would go up and put the chock under the left-hand wheel, because that would pull the left-hand wheel up, and the only safe way to do that would be to get to the side and do it if a man could. Q. You could see, when you would go to chock the left-hand wheel, after the left-hand wheel had been pulled up, the right-hand wheel being back here, so you would have to go up there and put your chock under, you could see that it wouldn't be safe for you to get in behind that wheel there, so that if that team should turn the other way it would push you against the log. You could see that ought not to be done? A. Well— Q. Just answer the question. A. Let me see how you asked it. Q. Here are the

two wheels right here, and the cart team has pulled to the right. That puts this left-hand wheel up here and leaves the right-hand wheel back here, if you go up there to put your chock under this left-hand wheel and you get in behind this wheel, if the team should then turn back the other way, that might push you back and catch you between the wheel and the log? A. Yes, sir.

"As to whether or not any one standing there could see that it would be safer to stand to the side and put the chock under there so as to be out of the way of the wheel pushing against the log, will say, the side would be the place to get if you could, and any one could see that. As to whether or not I could see it, will say, if you could get to the side that would be the place. It would be hard for me to tell how many times I chocked the left-hand wheel. We were in a rush to get the log out. Of course, I moved up my knot every time I got a chance, and he moved up his. I only had just a little place I could get in behind that wheel on account of that tree top. I just kept moving up my chock every time I got a chance. I don't remember how many times I put my chock under the left-hand wheel, several times though. We went about 10 steps, I reckon, and of course we made a yard or two at a pull. We had gone 10 steps, I guess. I don't know how many times I moved it up; several times, though. This tree top I speak of was right at the left-hand side of the wheel, just left room enough for me to crowd in between the wheel and the tree top. I couldn't help but notice the tree top when I fell in it after the log broke my leg. Of course, I noticed the tree top before that time, because there wasn't room to get up beside the wheel. If the tree top hadn't been there, I would have gotten to the side and put the chock under that wheel. Anybody would have gotten to the side if they could have done it. I couldn't because of the tree top. It would have been more convenient for me to put the knot behind the wheel and less danger in it, and I would have chocked the wheel from the side, if it hadn't been for the tree top. Of course, if I could have got to the side, it would have been a heap easy to walk up and put my chunk under it, and there wouldn't have been any danger of the log hitting me, if I had been out to the side. I knew it was less dangerous, and that I would have been less likely to have been injured by the log if I had gotten out to the side to chock it, and the reason I didn't do so was that there was a tree top out there. I knew that if I could have gotten out to the side, of course, it would have been safer for me to have been there to chock the wheel. We dug two or three holes with those cart wheels while we were trying to move that log with the cart team, I think. I never measured the last hole that we dug with the wheels, and I couldn't tell you how deep it was. They screwed around there until the wheels had gone down 8 or 10 inches, I expect. I don't know what distance in width the hole covered. The wheel would screw around this way and that way until it would work a hole down in the ground a right smart piece. Then they would jump the cart out of the hole, and then we would move up our knots. I expect the last hole they dug was about 8 or 10 inches deep, but I never measured it. It was a sandy place. I say that after that last hole had been dug the cart was jumped out of that hole, jumped forward. After the cart was jumped forward out of that hole, I put my chock under the left-hand wheel again, and Mr. Sheffield put his under the right. After that was done, Mr. Sheffield concluded that the cart team couldn't move the log; so he called for the bunching team to come there and help. After the cart had been jumped out of that hole and after I had put my chock under the left-hand wheel, as to what I did then while the bunching team was being hitched on, will say, I didn't do anything. I had got back out

of that place where I was. I had gotten back out of that place, out of that hole; I had got out of there. As to how far back I went from the wheel, will say, I went back past the end of the log. I wasn't doing anything while the bunching team was being hitched on. I was standing back beyond the end of the log. I saw them hitch the bunching team on. Mr. Sheffield hitched them. I am not positive now whether it was Mr. Sheffield or Mr. Smith. Sheffield brought the grabs around and picked up the tongs and hitched them onto the end of the log himself. I saw the tongs hitched onto the end of the log. They were hitched onto the end of the log. The bunching team consisted of two mules. That bunching team was hitched up like you were going to hitch onto a wagon. They had what we call a doubletree and a singletree hitched to that; the grabs hitched in the middle of the doubtree, as well as I recollect. There might have been a chain; there was a chain, I believe. There was a singletree behind each mule, and there was a doubletree and chain and tongs hitched to that. The tongs were hitched to the front end of the log. At that time, the log was lying straight under the center of the cart. In order to hitch the bunching team to that log, or in order to hitch the tongs to that log, the tongs' had to be taken to about where the center of the cart is. Q. So, the bunching team was hitched onto the log at an angle, wasn't it? A. Not much. You see the tongue is 9 feet long, and, when it is loaded out, it is 18 feet long. The bunching team came in right behind the cart mules, because they were right up against the tongue; the cart mules were out yonder 18 feet, from the end of the tongue back to the cart. It was already 9 feet, and, when they loaded out, that made it 9 feet more—18 feet from the end of the tongue back to the cart.

"As to whether or not there was approximately 12 feet of that log on the front part of that cart, will say, the big end was in front; the log was nearly balanced; the big end was a little the heaviest; and the long end of the log was behind. There was not room between the cart and the cart team for the bunching team to get right in there between them. The bunching team had to be brought up to the side of the cart team. The right-hand back mule of that cart team stood out as far as the cart wheel— just a little bit further than the cart wheel. It was somewhere about there. When the bunching team was brought up beside that cart team, the bunching team had to be hitched a little bit at an angle, in order to get in there to hitch to the front end of the log. I saw them hitched onto the front end of the log. As to whether or not I knew the bunching team was expected to pull on that log, will say, I never saw one hitched that way before. I didn't know what they were going to do. I wondered how they would manage to pull it hitched that way. As to whether or not I had common sense enough to know and did know that the bunching team was hitched onto the front end of the log and it would pull on that log, will say, I knew it was intended to pull that way somehow. I didn't know what they were going to do. As to whether or not I had sense enough to know and did know that if you hitch a team to anything and it pulls on that thing it is going to move that thing, will say, of course, if they pull hard enough. I was satisfied that the bunching team and the cart team together would pull it. I don't remember whether I testified on the other trial that I didn't think we were going to be able to pull it or not. The team they had to the cart was an old team, and I hardly ever saw it pull anything to amount to anything. The team that was hitched to the log pulled sometimes, and sometimes they didn't. I had seen them pull. I had seen them dragging logs and bunching them up in piles. I had seen that team snake logs. As to whether or not I

knew that team could pull a log, will say, I knew they had done it. I had seen them pulling logs. I didn't know whether they would pull it or not going up that steep hill. As to whether or not I had some doubt about whether they would be able to pull the log or not, will say, of course, I thought they might have to make some other plan to pull it. All of that time I was standing back behind the end of this log and watching what they were doing, and I saw exactly what they did. I wondered whether or not they were going to move that log that way. While I was standing there, and after they had hitched this bunching team onto the front end of the log, I saw Mr. Sheffield go there and whip the bunching team a little so as to get them in the notion to pull, get them ready to pull. As to whether or not, when he whipped the bunching team, they kind of tightened up on things a little, will say, sometimes they did and sometimes they wouldn't. Q. On this occasion? A. Sometimes they did, and sometimes they wouldn't. He whipped them several times. As to whether or not when they would make a run they would kind of tighten up on things, will say, when they did move the log they went right on up with it. Q. Now, after Mr. Sheffield kinder spirited the team up some with his whip, where did he go to? A. He told me— Q. Where did he go to? Didn't he go up to the front of the cart team? A. He stood there until they got started. When they got started, then he went up to the cart team. I say that, after they got started to pulling, he went from the bunching team up to the cart team. Just as they went to start, he halloes back to me—

"I say that after they got started to pulling, he went from the bunching team up to the cart team. I am pretty sure of that. After the log had moved a piece, I don't know what he did, after it went four or five steps. Mr. Sheffield was fighting that bunching team when the log began to move. He was trying to get the bunching team to pull. At that time he was about three lengths of a mule from me, I reckon. Q. Do you know about how far that is? A. As well as I recollect, he had got up here, and he halloed back to me— Q. I am not talking about that. I am talking about when the teams first began to move the log. You say Mr. Sheffield was then whipping the bunching team, trying to get the bunching team to pull. At that time how far was he from you? A. I was back here. I was back here at the end of the log, and he was over here where the cart team was. Q. Where the bunching team was, you mean? A. Yes, sir.

"I don't know just how far that was from me; I don't know the length of a mule. There was more than 12 feet of that log behind the cart; the longest end of it was behind. There was something like 13 feet of it behind. There was about 13 feet of the log behind the cart, and I was beyond that. I was about 14 feet from the cart. From the cart up to the team was about 18 feet. The log being loaded out, the cart team was about 18 feet from the cart. The bunching team was not along by the side of the cart team. The bunching team didn't go quite up to the cart team; it was a little behind the cart team. The heads of the bunching team mules were along about the hips of the cart team mules. While the cart team was 18 feet from' the cart, the bunching team was about a mule's length closer to the cart. I don't know how many feet that is. I don't know whether it is six feet or not. I never measured a mule in my life. I don't know whether that would put the back end of the bunching team about 6 feet from the cart or not. I never did notice enough about the length of a mule; I couldn't say. As to whether or not, if I was about 14 feet from the cart and the bunching team was about 6 feet in front, Mr. Sheffield must have been somewhere about 20 feet or more from me, will say, he was back on the right-hand side of the mules,

in behind the mules like. Mr. Sheffield halloed to me to take up as much as I could just about the time the team made a little pull and moved the cart just a little and halted. He halloed back to me to catch all I could with my knot, and I ran back up in that hole to push my knot up, and, as I started to push my knot up, this log came around and caught my leg. When Mr. Sheffield halloed to me to take up as much as I could, I was back behind the end of the log. Then the cart had already moved forward a little bit, just a little, just moved a little, just pulled a little. They did not keep on pulling; they stood right there then, and, when they made the next pull, they went on. After he halloed to me to take up as much as I could, at which time I was back beyond the end of the log, I came clean on up to the cart wheel to move the chock up. While I was putting the chock under, the log came around and struck me.

"Q. Where was that stump with reference to the hole that had been dug in the ground there? You remember you said there had been a hole dug in the ground and the cart had been jumped up forward out of the hole? A. As well as I recollect—of course, I was suffering after my leg was broke—I looked at everything as close as I could. A man suffering as bad as I was with a broke leg ain't supposed to notice everything; but, as well as I remember, I looked around after Mr. Sheffield came to me and examined my leg, and says, 'It is broke'— Q. I want to know how far the stump was from that hole? A. I don't just how far it was. I suppose it was 4 feet or 4½ feet from the hole. Q. In order that you may understand me, Mr. Hardy, say here is the hole that the cart wheel dug there; here is another hole over here; after they jumped it out, the cart wheels were both out of the hole; you had to jump them out of those two holes— where was that little stump with reference to this hole here? A. About 4 feet right out here. It was 3½ or 4 feet back of the hole. When I fell, I fell right back around the stump. I crowded in between the stump and the log. The stump was, I suppose, 15 or 17 inches, maybe a foot and a half, something like that, off out to the side. I had to crowd in between the stump and the log to get the scotch behind the wheel. In going up there after Mr. Sheffield halloed back to me to take up as much as I could, in going up to the wheel, I went between the stump and the log, and I had to crowd in between the stump and the log. Q. How far did you have to go from the stump to the wheel in order to get the chock under? How far was it from the stump up to the wheel? A. I suppose it was 3½ or 4 feet. Q. I thought you said it was 3½ or 4 feet from the stump up to the hole. A. To the wheel where I put the chock under. I reached right over the hole like this (indicating), and the stump was standing back out here. The hole was betwixt me and the wheel here, right in front of me. As to whether or not I leaned over the hole in order to get the chock under the wheel, will say, my chock was on this side of the hole, and I picked it up. I never did get the chock there. When they broke my leg, I dropped the chock before I put it behind the wheel. After this cart had been jumped out of this hole and I had put my chock under the left-hand wheel, during all of the rest of the time while they were bringing the bunching team up there and hitching them onto the log, and while they were whipping the team, I was standing back behind the end of the log until Mr. Sheffield halloed to me to take up as much as I could. And he halloed that to me after the teams had moved forward just a short distance. As to whether or not I knew that when the bunching team pulled on that log they would necessarily swing it over towards that left-hand cart wheel, will say, I was wondering what it was going to do. Of course, they had never pulled it, and, when they did pull, it fastened me. I was standing there looking at the team

hitched onto that log. Q. You saw them hitched on at an angle; you knew then that, when the team pulled on that log, they were going to cause it to swing over towards the left-hand wheel? A. I knew it would swing that way some, yes.

"I had not had my leg hurt that morning; it didn't hurt. I got it fastened, but it didn't hurt. I did not get it pretty nearly hurt; it wasn't hurt at all, just fastened between the wheel and the log. I got it fastened between the wheel and the log. Of course, I knew that I ought to keep out of the way of the log if I didn't want to get hurt by it. That is the reason why I had gone back out of the hole until Mr. Sheffield put me back in there again. I had gotten out of that hole and had gone back to the end of the log because I knew it was dangerous to be there. I knew that was a dangerous place to be. I knew when the bunching team pulled on that log it would swing round to the left, and that wasn't any place for a man to be while that was going on. Of course, I got out and went back to the back end of the log to be out of the way, but I was hired by Mr. Sheffield and working under his rules. When Mr. Sheffield halloed back there to me to take up all I could, I knew in going up there to put my chock under that I was going in a dangerous place; but he had told me to do it, and I went ahead and did it. As to whether or not when we went to load the logs out, that is, went to lift it from the ground and suspend it under the cart, I would always hallo, 'Ready,' to the driver, will say, when I would drop the grabs down and fasten them I would say, 'All right.' As to whether or not I wouldn't hallo, 'Ready,' until I had gotten out, will say, very often I would have to hold the grab there until it would catch. That morning when I set the first grabs, when I laid them down and fastened them on, I said, 'All right.' The cart man said, 'You get out of the way,' and I got out, and from that time on when I fastened the grabs I got out and did like he said. One reason I got out of the way was to keep from getting hurt by the log. When I got hurt that morning, I could see there was danger there. A heap of times the log will roll over against the wheel and catch a fellow. Sometimes it will slip loose and drop down. When that log was being loaded out, when they were pulling on that log, of course I knew that back in behind that wheel close to that log wasn't any place to be, if a fellow could get away.

"Q. Now, look at that photograph, will you, and see if that looks like the kind of log cart you were using at the time? A. Yes, sir; that is the kind of one they were using. That looks like it to me. That (meaning photograph introduced in evidence marked 'Exhibit A') represents the cart all right, but not the place where it was at. On that photograph that you showed me, there is a lever that sticks straight up with a chain attached to it, and that chain runs from that lever down to the tongue in front. It isn't a chain all the time; sometimes it is a rod of iron. That tongue works in a groove. When that tongue is shoved all the way back in the groove, then that lever stands up straight, and the tongs we fasten in the log then come down to the ground. When the cart team pulls forward and pulls the tongue forward, that pulls that lever down and raises the log from the ground. Q. Now, I will ask you if this photograph correctly represents a log raised from the ground under a cart? A. It is not exactly like they haul them up there. Q. What is the difference? A. They carry the big end in front there, and here the little end in front. The only difference is that on this picture the big end is behind, instead of in front. That represents a log loaded out as we have referred to in the testimony. The front end of the log in that photograph (Exhibit B) that you have just shown me is raised from the ground, and the back end is on the ground, and the only differ-

ence I see is that up yonder where I was at work the big end is in front.

"Q. Now, Mr. Hardy, with a log the size of the log that you had under the cart, at the time you were hurt you were standing behind the wheel to chock it, how close would your right leg be to the wheel? While you were standing behind the left wheel to chock it, how close would your right leg be to the wheel? A. I don't know as I paid any attention. I couldn't tell you to save my life whether the distance between the cart wheels is 6 feet or not. I don't know. If I were standing behind the left wheel to chock it, I could easily touch the log with my right leg. May I show you how I was? Q. Yes, sir; if you care. A. I had gotten as far outside as I could. The tire of the cart was right here, and I had got with my knot this way (indicating). Standing where I was, I could touch the log with my right leg. I got as far outside as I could in order to reach under there as far as I could. Like this (indicating) was the cart wheel, I couldn't put my head right up against it. I did not get on the inside with my left side to the wheel because it is always natural for me to get that way. I got there so as to put my right shoulder to the wheel. I couldn't get any further up there, couldn't get by the side of it, and I got just as far as I could out. Q. Does that picture show with substantial correctness about how close a man would be, with a log that way under a log cart, behind the left-hand wheel? A. Why, something like that. Well, he ain't standing quite in the position I had to get in. Q. This man has his right shoulder to the wheel? A. Yes, sir. Q. You would be standing just a little bit further out than he is, you think? A. Something like that. You see my leg was stuck back here, and this stump was right back out here. Q. You were very nearly in that position? A. Mr. Sheffield said, 'Run there and put the chock there,' and, without any thought, I just run in and put it in. Defendant: I move that that testimony be stricken. Court: Gentlemen, you will not consider it at all.

"I was something like in the same position that this man is shown to be in on this picture, with the exception that my leg happened to be out here. My right leg was a little further back. I was about in that position, except my right leg was a little further back. Q. I wish you would look at this and state whether or not it represents with substantial accuracy the way in which the bunching team was brought up and hitched onto the front end of the log on the occasion that you were hurt? A. Yes, sir; but the team wasn't standing off like that is. They were up here by the side of the other mules. The bunching team was up by the side of the other mules. The bunching team was up by the side of the cart mules. That is the way they were hitched on, with the exception of the fact that on the occasion that I was hurt, the bunching team was up by the side of the cart team. As to whether or not I said awhile ago that the head of the bunching team mule was about the hip of the cart mule, will say, when they loaded it out, I think it would be; I never noticed in particular. This picture shows that with substantial correctness, except it ought to show the bunching team along by the side of the cart team.

"The picture that you now hand me does not represent the way the bunching team pulled on the occasion of my accident, as I understand it. That is not the way I understand that they pulled. The mules' heads were turned right back to where this stump is. When they jerked that log on me, the mules' heads were turned right out here (indicating) at direct right angles. They made the run and run right off that way; they went right at right angles to the cart. This picture shows with correctness the way the bunching team pulled, except my contention is that they pulled at right angles. They went right straight across out here (indicating).

"I say that, just immediately after I was hurt, I looked up and saw the bunching team headed out at right angles to the cart. My leg was broke while I was stopped, and I straightened up, and I tried to stand, and my face was out towards where I could see where the mules were, off at right angles. As I raised up, I could see what the mules had done, and I turned around and fell right around the stump. I say that Mr. Sheffield halloed to me to take up as much as I could, and I then ran up towards the wheel. From the time I started to run up there towards that wheel, the first time I noticed that bunching team was after my leg was broke and I raised up. I didn't see them pull; but, when I got up to where I could look, the mules were out at right angles. As to whether or not the log went right on up the hill, will say, the cart team had taken a notion to pull, and the other team swung back to the side of them. They kept pulling out yonder until they swung back, and then they went right on with it. The cart never moved until it broke my leg. As to whether or not that team never did stop from the time my leg was broken, will say, I never noticed after the team got out a little piece; I went to noticing my leg then. As to whether or not I testified on the last trial that they went straight on up the hill, will say, as far as I know they did; they went out of my sight. I know they went out of my sight, because there there was a tree top here and they turned. When they got out there a little piece, the log cart and mules and all turned, and that put that tree top between me and them. They turned around the tree top and me lying down. I never noticed about where they went until Mr. Sheffield came back down there. They turned around the tree top, and when they did they got out of my sight. I say that the cart team pulled that log on up the hill with the bunching team pulling the log at right angles. The bunching team finally swung back to the side of the cart team when they pulled it just a little piece. They got back by the side of it and went around that tree top where I didn't see them any more. I looked to see if I could see them to halloo to Mr. Sheffield and tell him what had happened to me, but it was around where I couldn't see, and they were fighting the mules going on up the hill, and I decided if I hollowed they couldn't hear me. I couldn't see them then. When they got around the tree top, they had the tree top between me and them then. As to whether or not I said it was Mr. Sheffield that told me to catch all I could, will say, I took it to be him. There was some one hollowed up where they were fighting the teams, and I took it to be Mr. Sheffield. I afterwards asked Mr. Sheffield if it was him hollowing at me, and he said, 'Yes.' I took it to be Mr. Sheffield, but I didn't know at that time for sure it was him. I did not testify on the last trial of this case that I asked Mr. Sheffield if it was him. I don't know for sure that I had seen Mr. Sheffield and asked him. He told me it was him. As to whether or not I know that he said on the last trial of this case under oath that he didn't tell me any such thing, will say, I know he did. I don't know whether he is here or not. I haven't seen him. I do not know that he is in Louisiana. I know that I haven't seen him here.

"As to what kind of work I have been doing during the past year, will say, I have plowed a part of two days. I did not make a crop this year. I just plowed a part of two days this year, and I saw that I couldn't plow, and I sold out and quit. I was trying to plow for myself on my place in this county. I owned the improvement. After I got crippled, I sold my place. As to whether or not I bought another place, will say, I bought an improvement. I am not still living on that improvement. I sold

# 222 196 SOUTHWESTERN REPORTER (Tex.)

out the improvement. I am now living up at Mr. Reese's place, at the Turpentine. I butcher a few goats, and peddle milk and butter and chickens and eggs at the Turpentine. They haven't a market there. I sell off such things as I have so as to try to live—stuff that my wife and children raise. They milk the cows and churn, and I take the milk and butter over there and sell it. I do not own a place there. Mr. Reese just told me to move on his place and stay there until he needed it. It was on that improvement that I owned up in the upper end of the county that I plowed the couple of days. I was not putting it in cultivation. I had two boys that had been cultivating it for the last three years for me, and they quit me, and that left me to plow myself, and I got out and tried to plow a couple of days, and I saw that I couldn't do it, and I sold the improvement to Mr. Bob Hays, and moved to the Turpentine, and I peddle parched peanuts, and my wife has a few chickens, and I sell a few eggs and milk and butter. I have got to peddle in order to keep going.

"I didn't see them put any check line on that team. I know there wasn't any on there because they couldn't have gone to the right, if there had been. I know there wasn't any check line on them because they couldn't have gone to the right like they did, if there had been. I am certain that there wasn't any check line on them; that is, fastened to the other mules or to the tongue or anything because they couldn't have gone where they did if there had been. As to whether or not they might have broken the check line, will say, they hardly ever break those lines; they generally use some good ones. As to whether or not, if they had put a check line on there, I would have seen it because I was standing there watching them, will say, I wasn't watching them as much as I was watching the job Mr. Sheffield had put me at. As to whether or not I wasn't doing anything at the time they hooked that team on but standing there watching, will say, I was waiting for orders from Mr. Sheffield to do something else. At that particular time while I was waiting, I don't know that I was doing anything but just watching them; I was waiting for orders to do whatever Mr. Sheffield said do. I didn't know whether that team was going to pull up along by the side of the cart team or out to the side.

"I stated awhile ago that I got pinched in there that morning, that I got hurt between the wheel and the log; I got caught in the wheel. I got caught by reason of the wheel moving to the log. There is no danger in chocking a wheel, standing behind the wheel chocking it, when there is no team hitched to the end of the log. At the time I was pinched, there was no team hitched to the end of the log. As to how that happened, will say, Mr. Stimits had backed his cart onto a log, and I was off out yonder 30 or 40 yards fastening the grabs on the other man's cart, Mr. Bullock's, and Mr. Stimits had stopped his cart across the log and I came on, and when I got under there to hold the grabs down to fasten them, he pulled his mules around and fastened my leg back against the wheel. I was under the cart to the side of the wheel. A man standing behind a wheel couldn't be caught at all by turning it to the log. I suppose there would be danger in a man standing to the side of the wheel, that is, between the wheel and the log if the team was turned one way or the other; he would get his leg caught between there. The wheel could move to the log or the team could be pulled around and fasten his leg to the log. There would be no danger of the wheel striking the log after the log was loaded out. When I went to scotch that wheel, I did not anticipate any danger; I never thought anything only to do just what Mr. Sheffield said do. I couldn't say that I did anticipate any danger when I went in there to scotch that wheel; I

never thought about anything only to do what Mr. Sheffield said do. Court: He has asked you if you anticipated any danger when you went to chock that wheel? A. Right at the present time, I will say I didn't see any danger in right then, or Mr. Sheffield would have undoubtedly said so. I didn't see any danger right at that time. As to when I learned that it was dangerous, will say, I have noticed it all along since that time and have seen what would happen to a fellow in case he done that. I found out when I was hurt that it was dangerous to go there; I could see it then. I did not see or anticipate any danger before I got hurt. I couldn't see any danger until after I got hurt; I could see the danger then. As to whether or not, if I had known that it was dangerous to go in there and scotch that wheel, I would have gone in there to scotch it at that time I did, will say, of course, if a man knows there is going to be danger he ain't going to put himself where he will be crippled up. I would not have done it. Q. When you stated to Mr. Logue awhile ago that you knew it was dangerous, did you mean to tell him that you knew it was dangerous before you went there, or you found out since you got hurt that it was dangerous? A. After I got hurt, I could see the danger, of course. Court: Why was it you stated to Mr. Logue that you went out from that wheel to the back end of that log because you saw it was dangerous? A. I thought I had done all I had to do, and I got back out of there.

"I said that the tongue, when it is loaded out, is something like 18 feet long. It is something like that as well as I recollect; I never did measure it. The mules' bodies cover a portion of that tongue back towards the cart. The nose of the mules are about even with the front of the tongue. The front mules wouldn't be 18 feet from the cart, I don't think; I never did measure it. If the noses of the mules were about the end of the tongue, a part of the tongue would be covered by the length of the mules.

"Q. Mr. Hardy, if an employé fails to obey the commands of his boss, what happens to him? Defendant: We object to that as being wholly immaterial, also because it calls for a mere conclusion of this witness. Q. If you had refused to obey the commands of Mr. Sheffield, what would have been the result? Defendant: We object to that for the same reason. The witness couldn't know what would have been the result. Court: Objection overruled. (Defendant excepts.) A. Why, he would get his time. I mean by getting his time that he would be sent to the office for his pay; they would turn him off. If a hand doesn't obey the commands of the boss, he is fired; that is the rule there. I mean that is the Kirby Lumber Company's rule. I understood that to be the rule at the time I was injured. I have seen two or three turned off for not doing what they were told to do. Defendant: We except to all of this testimony on the grounds stated. Court: Objection overruled. (Defendant excepts.) A. I don't know that I ever measured the height of one of those cart wheels. I would suppose it is something like 8 feet high. I told you awhile ago that when I hooked the grabs in the log, and the cartman would start to load out, I would get out of the way. Q. And that one reason why you got out of the way of the log was to keep from being hurt by the log? That is true, isn't it? A. I was going to tell you. It is true that I got out of the way of that log. Certainly the purpose of my doing that was to keep from being hurt by that log. Q. You told me awhile ago that, after you had put that chock under that wheel after it had been jumped out of the hole, you walked clean back to the end of that log because you knew it was safer back there, is that true? A. Yes, sir; it is true. The fact was—

"As to whether or not I knew it was dangerous for me to remain up there where I was behind that wheel when that log was being moved, and I

walked back to the end of the log, will say, I don't know that I knew there was any danger up there, more than I was through there. As to whether or not I told you awhile ago, when you asked me the question that when I chocked that wheel I walked back and got back beyond the end of the log because it was safer for me to be back there than up there, will say, it was reasonable to suppose that it would be safer back there. I guess I supposed so at that time. I guess I told you awhile ago that I thought it was. As to whether or not I knew at that time that it was dangerous for me to remain there back of that wheel where I was, will say, it was a close place in there. It was a close place in there, and when I got in there and put my chock in there I was through there, and I got back out of that hole, and stayed out until Mr. Sheffield ordered me back in there again. That was a close place that I was in there. I did not know that it was a dangerous place then, but I knew it as soon as I got hurt. As to whether or not I knew, when I put that chock under that wheel there in that close place that I testified about, that that was a dangerous place and that it was safer for me to be back beyond the end of that log where I went, will say, I would be bound to think it was safer back there, but at the same time— Q. Answer my question, Didn't you know it was dangerous for you to be in that close place there while that log was being moved? A. I can't say that I knowed it was dangerous, because I don't believe I would go in a dangerous place and get hurt. As to whether or not I told you while ago that I got out of that place and walked back beyond the end of that log in order to be in a safe place, will say, of course, a man can't get out of a close place sometimes. I did not know that I was in a dangerous place, not if the log stayed where it was. Q. With that log being moved, you knew at the time you were in that close place there behind that wheel where you had chocked it, you knew that wasn't a safe place? You knew there was danger of being hurt by the log if you stayed there? A. No, sir; Mr. Sheffield— Q. Without regard to what Mr. Sheffield told you or what he didn't, didn't you know that that place, that close place you speak of, in there behind that wheel while they were moving that log, was not a safe place for you to be? Answer that question. A. No place that is a close place, I wouldn't suppose, would be a safe place.

"I knew it was a close place. I could not say that for that reason I knew it was a dangerous place. I have known all of my life that a close place is a dangerous place to some extent. As to whether or not I told you awhile ago that I would have gotten on the outside of that wheel to chock it if there hadn't been a tree top out there, will say, of course, I could have put it there handier. As to whether or not I told you there was two reasons why I would have gotten to the side of the wheel to chock it, one was it was more convenient, and the other was that it was less dangerous, will say, I expect it would have been. I do not mean to change the testimony that I gave you in answer to your questions on my cross-examination. As to whether or not I told you that there was two reasons why I would have gotten to the side of the wheel to chock it, one was that it was more convenient, and the other was that it was less dangerous, will say, I don't remember that I said two reasons; I don't remember it. If I did say that there was two reasons why I would have gotten to the outside of the wheel to chock it, one was that it was more convenient, and the other was that it was less dangerous, I told the truth about it. I do not mean to go back on it now. If I said it, I don't mean to go back on it now. Of course, I told you that I noticed that brush out there to the side, and that brush kept me from getting to the side of the wheel to chock it; that is the reason I had to get where I did get. I noticed that tree top there at the time. I couldn' help but notice it. As to whether or not I would have gotten to the side of the wheel to put that chock under there if that tree top hadn't been there, will say, I couldn't get there. As to whether or not I would have gotten to the side of the wheel if it hadn't been for the tree top, will say, I guess I would have got to the side of it if I could have done it. Court: Did Mr. Sheffield see the position that you occupied when you were chocking the wheel? A. Yes, sir; he saw me because he was at the other wheel. Court: Just over the log from you? A. Yes, sir. Court: Did you chock it a great many times? A. Yes, sir; he chocked his wheel awhile, and me mine awhile; first one and another. He moved up his chock and me mine. Court: Do you know whether he saw the brush pile on the side of the wheel or not? A. He couldn't help but see it. He knew it was there.

"While Mr. Sheffield was back there helping me chock the wheel, at that time there was nothing but the cart team attached to the cart. While the bunching team was off out yonder, he was back here with me at the wheel. Mr. Sheffield was chocking the right-hand side of the cart. I was chocking the left-hand wheel. After the cart got down in this hole and it was jumped out, Mr. Sheffield went on up to see about hitching the bunching team on. I don't know whether he remained there by the cart team all the time from that time on or not, because he was dodging around first one side and another. Just where he remained, I don't know. He was pretty busy with both of those teams and with the cart, too. He was pretty busy. Mr. Stimits had all he could do driving the cart team. Mr. Green Smith did not handle the bunching team pretty well then; he failed to do it that time. I don't know that I did have a better chance to look out for myself than anybody else there. As to how close those cart mules are to the cart when the tongue is slipped back in place, will say, they are about like a wagon tongue, I think. The two back mules are back to the doubletree, something like a wagon. When the tongue is slipped back, they are something like two or three feet from the cart, I guess; I never did pay much attention to it. When they go forward, they could only go forward 9 feet; that is, the slip of the tongue. The hind part of the back mules could not go any further than 12 feet from the cart. If the mules are 3 feet from the cart when the tongue is slipped back and there is a 9 foot slip to the tongue, when they pull that tongue out and load that log out, they would be something like 12 feet from the cart. I never did notice very particular about how far it was. Court: He said if the tongue slipped 9 feet, and they were 3 feet from the cart when they commenced to slip, they would be 12 feet from it when they quit slipping? A. I think so. I don't know how much of that log was behind. The log was almost balanced. Sometimes one of those logs has a very rich butt, very heavy, and, if it is, they catch it further in front; if it ain't that way they catch it somewhere near the middle. I don't remember how this log was caught on that occasion. The hind end of it was a little the heaviest, and there was bound to have been a little more behind than there was in front. I don't know whether there was about a foot more behind than in front or not. As to whether or not there was about 10 feet in front and about 14 behind, will say, the stump of that log shows to be a rich butt. I expect there was something like 10 feet of that log towards the front of the cart and about 14 feet behind the cart.

"That wagon was going west. I would judge that that stump was 17 or 18 inches south of the rut. The stump was 16 or 18 inches outside of the rut. It was something like that; I didn't measure it; I was just guessing at it. Those grabs come around this piece that stands up here. In dropping the grabs down, if the grabs are

standing perpendicular, they would fall on the back of the axle. As to what is the diameter of those axles, will say, I never did measure one; but they are approximately about 8 inches, I expect. I don't know how far it is from that axle to where the doubletree is attached to the tongue when the tongue is slipped back. I never did measure it. Those hounds come out this way (indicating) and come out to the tongue, and the tongue slips between them, and the doubletree is out just a little beyond that. I couldn't say how far out it is; I never did notice it. It is 4½ or 5 feet, something like that, from the axle to the doubletree. If you should take a straight edge and put it against this wheel and extend it right across the tongue and let it rest on the other wheel, it would be 9 or 10 feet from that straight edge to the main team when the tongue is loaded out.

"While I was chocking the wheel behind there first before the bunching team was hitched on, Mr. Sheffield was chocking the other wheel. He saw and knew that I was behind the wheel chocking it. Mr. Sheffield knew that I was behind that wheel chocking it. He knew that I was there. He is bound to have known that I couldn't get to the side of the wheel to chock it on account of the brush. The brush was right there, and he could look over there and see what I was doing, see the brush. He had been right around that brush for some little bit. He walked around the brush one time and got Mr. Bullock's whip. I saw him. When he quit chocking the wheel, he walked around there and borrowed Mr. Bullock's whip. He went around the tree top, the pile of brush tops that kept me from getting to the side, and for that reason I know that he knew it was there. I know the length of a cart tongue. It is generally sawed to be 30 feet. I have seen and measured a cart tongue since I was here last night. It is 8 feet from the axle to where the doubletree is when the carts are not loaded out. It is 8 feet from the axle to the doubletree. It loads out 12 feet when it does load out. If it is 8 feet from the doubletree to the axle before it starts to load out and it loads out 12 feet, it would then be 20 feet from the back part of the mules back to the cart axle. If the log was suspended under those wheels, under the axle, and there was 10 feet of that log in front, it would be 10 feet from the hind part of the mules to the end of the log. When they told me to put the knot behind the wheel to keep it from going back in that hole, as well as I saw, the bunching team mules were standing up by the side of the tongue, then— near that. They were up by the side of the other mules where the tongue was, like my fingers that way (indicating). They were not loaded out then. They were not loaded out when I started to go in there. They were up by the side of the other mules. · I don't know how they were after they loaded out, because when I stopped to put my knot there they commenced to load out. Before I got my knot there, the log swung around and broke my leg, and that stopped me from seeing just where they were; I had something else to look at then. I guess the bunching team was hitched to the log when I went in there to scotch the wheel the last time. They brought them in there and turned them around up by the side of the other mules. Then they told me to put my knot behind the wheel. When they told me to take up the slack, they hadn't loaded out then; they were all standing still.

### "Questions by the Court.

"What I mean by 'loading out' is that, when they load out, they pull the log up. They back up and latch, and that lets the log on the ground; they back up and latch and jump out. When they pull the lever down, these grabs pull the log up. That is what they wanted the knot there for—to keep that cart from coming back in that hole. When I was told to put my knot un-

der there, I was standing back beyond the end of that log. As to how the team was standing then, will say, they had brought the bunching team around, and they were standing by the side of the tongue mules, just like my fingers. The mules hitched to the cart were just as far back as you could get them back. The bunching team had to be put by the side of the other mules because there wasn't space enough for them between the hind end of the other mules and the cart. They were standing side by side. When they were in that condition, the mules hitched to the cart had to start up first. The bunching team mules were then supposed to wait until that log was raised. That log was raised by the mules hitched to the cart moving up first, and they moved out the full length—12 feet. They had to move up about 12 feet before the bunching team mules were supposed to pull. Right at the time he told me to take up that slack, they were all standing abreast. Court: Right there is what Judge Powell wants you to tell—From then on what happened? A. When I was told to put my knot behind the wheel, I was back here at the end of the log. They told me to put my knot behind the wheel, and I stepped up there to put my knot up, and, as I stooped, they loaded out with the team.

"That loading out means that the team hitched to the cart was supposed to go its full length and raise up the log. That is what they call loading out; and when I stopped to put my knot there, while I was fastening my knot there and before I raised up, the bunching team had gone around and jerked the back end of this log on my leg. As to where this bunching team went after that, I don't know. As to whether or not I was just fixing to put my knot under there, will say, the knot was back on this side of the hole next to me, and I had gotten the knot and was placing my knot behind the wheel. They were still when I commenced it. Q. Mr. Hardy, what about the distance from the end of the grabs on the bunching team up to the hind end of the bunching team? A. The distance of the grabs — Q. Take the bunching team rigged up with the regular appliances, that is, with the singletree, doubletree, and grabs, and again, how far would it be from the grabs up to the mules? A. It would be owing to how long a chain they had; the way it looked to me, they were standing up by the side of the other mules. Q. I am not talking about where they were standing. I simply want to know the distance from the end of the grabs up to the mules? A. As near as I could tell, it would be something like 10 feet.

"As to whether or not when the log is not loaded out the cart mules are right up against the cart, will say, they are 8 feet from the axle when they are not loaded out. As to whether or not I mean to say that on the occasion in question they brought the bunching team up there and hitched it to the front end of the log before the log had been loaded out, will say, well, now, yes; when they hitched the bunching team they backed up and latched and jumped out of the hole. They hitched the bunching team before they backed up. As to whether or not they hitched the bunching team onto the log while the log was lying flat on the ground, will say, they loaded it out when they hitched the bunching team on. They backed up and latched and jumped out of the hole after they hitched the bunching team on. They never jumped the cart out of the hole until they hitched the bunching team on. They did not jump the cart out of the hole before they ever brought the bunching team there. They brought the bunching team around and hitched them to the end of the log, and Mr. Sheffield told them to back up and jump it out of the hole. They backed up and jumped the cart out of the hole after the bunching team had been hitched to the log. I say that, when the cart team is backed up, it is 8

feet from the axle. The axle is about 4 feet from the front end of the wheel. It is about 4 feet between the rim of the wheel and the cart team when the cart team is backed up. On this occasion, there was about 10 feet of this log between the axle and the cart mules. If it was a 24-foot log, there must have been 14 feet of it behind. When the cart mules were backed up, they would back up so that that log would be 2 feet past them. If the bunching team was hitched onto that log and the cart team was backed back after that bunching team was hitched on, the cart team would not have had to back back across the grabs and the chain that was hitched to that bunching team. Q. If the grabs on the bunching team and the chain is hitched to the front end of that log and the front end of that log would be 2 feet past these cart mules when they are backed back, 2 feet past the hind parts of the cart mules, how could these cart mules back all the way back without backing across that chain and these grabs or backing into it? A. Here is the doubletree; here is the singletrees on out here, then the other chains come on out here, and the mules never could back to the doubletree. Q. I am not talking about the bunching team mules. A. That is what I am talking about—the mules to the cart. The chains are something like that long (indicating), and the singletree comes out here, and the trick it fastens with comes out apiece, and that puts the mules out that far probably from the doubletree; the mules wouldn't touch that log in backing back. Q. Do you mean to say that the mules hitched to the cart wouldn't come back to the end of the log? A. Yes, sir. Q. Then you are mistaken about saying it extended 2 feet beyond the hind parts of the cart mules? A. I meant 2 feet beyond the doubletree they were fastened to. Q. You testified just a minute ago that, when the mules hitched to the cart were backed back as far as they could come, the mules would be 8 feet from the axle and the log was hitched right under the axle and 10 feet of it extended in front; if that is true, then the log would extend up in between the mules 2 feet from their hind quarters. If that is true, and the bunching team had been hitched to that log at the end of it with the grabs, how can you account for that bunching team being hitched there in that condition? A. I don't know, but they were right up side and side. I wasn't around there where they were.

"As to whether or not my theory of this matter now is that they hitched the bunching team onto the front end of that log while it was loaded out and after they did that then they backed the cart team back and dropped the log on the ground again and jumped the cart out of the hole and that after they did that then they loaded out again, will say, I will tell you what they could have done. As to whether or not that is my theory of it now, will say, I didn't see what they done around there. All I know was the mules were standing up there side and side. The grabs could have been out of that log, and they could have put the grabs back in again. They were put in at first. Q. Let me see if I understand you. Do I understand it to be your theory now that they first hooked the bunching team onto this log while it was loaded out, and after they did that they backed that cart team back and dropped the log on the ground and jumped the cart out of that hole, and then they had the cart team load the log out again? Is that your theory of it now? A. I was going to show you. Mr. Sheffield— Q. Answer my question: Is it your theory now that they first hitched the bunching team onto this log while it was loaded out, and after they did that they backed the cart team back and dropped the log on the ground and jumped the cart out of the hole, and after they did that they loaded the log out again? A. Yes, sir; they done that. Whether that bunching team was hitched when they were backing up there and loading out

196 S.W.—15

again, I don't know. That is my theory about it. In other words, I mean to tell the jury now that they first loaded out, and then the bunching team was hitched to the log, and that they then backed up in order to jump the cart out of the hole, and that when they did that I don't know whether the bunching team was hitched to the log or not. When they backed up, they could have loosened those grabs. I don't know whether they were still left there or not; but when they raised that log, as the log commenced raising, I was just placing my knot under the wheel, and the next thing I knew my leg was broke. When I stooped, the bunching team was standing right by the side of the other mules, and when they loaded out, when I got to where I could see, again, the bunching team was off to the right.

"The bunching team and the cart team did not try to pull that log when it was first loaded out before they backed up and jumped that cart out of the hole. They never made any effort to pull it then. This hole that I refer to is a hole that was dug there while we were turning that cart from side to side. When they brought the bunching team up there and hitched that bunching team to the front end of that log, they never tried to pull that log out of the hole; they started to, and Sheffield stopped them. They never made any effort to have the cart team and the bunching team pull that log while that cart was down in that hole; they started to, and Sheffield told them to let it jump out of the hole first. Mr. Sheffield himself never tried to get those teams to pull that log while the cart was down in that hole. He didn't do that. That was the hole that I say they jumped the cart out of after the bunching team had been hitched on. As to whether or not, while the cart was down in that hole, Mr. Sheffield did not whip the bunching team or cart team to try to get them to pull, will say, he commenced just as they commenced to load out. If he whipped those teams while the cart was down in that hole, I never noticed it. The time that I testified about seeing Mr. Sheffield whip the teams was not while the cart was down in the hole. It was after the cart had been jumped out of the hole. He commenced to whip the teams just as they commenced to load out. I testified that Mr. Sheffield went around and whipped the bunching team and then went around and whipped the cart team and came back around and whipped the bunching team. He was not whipping that bunching team and cart team while this cart was down in the hole; they were not doing anything then. He never whipped them at all until after the cart had been jumped out of the hole—just as they commenced to load out. As to whether or not he never whipped the teams until the cart had been jumped out of the hole, will say, he whipped the cart team. He whipped the cart team first when he was trying to get them to pull before the bunching team was hitched on. Q. I am talking about after the bunching team was hitched on. A. As well as I could see, the bunching team was hitched on while the cart was down in the hole. I am not sure, but I think Mr. Sheffield, as well as I remember, took hold of the grabs and fastened them while the cart was down in the hole. The way I saw it, the bunching team was hitched on while the cart was down in that hole, and they started to make a pull. Mr. Sheffield didn't whip that bunching team while they were down in that hole. It was after the cart had been jumped out of that hole before Mr. Sheffield whipped those teams. As to whether or not the log was loaded out when he was whipping those teams before they ever began to pull, will say, they were loading it out right then. It is not necessary to whip a team to load the log out. You can whip the team that is loading the log out; Mr. Sheffield was whipping them. As he was loading the log out, he commenced whipping the bunching team. As they were loading out the log, Mr.

Sheffield commenced whipping the bunching team. The time when I went under there to put my chock under was not while they were loading out the log. As to whether or not I said that just as they started to load the log out I went in there to put that chock under the last time, will say, they backed up and latched and jumped out of the hole and ordered me to put my chock under. They were all standing still at that time, and I went in there, and just as I got hold of my knot they started to load out, and Mr. Sheffield was whipping that team on the right, and Mr. Stimits the cart team, and before I could raise up the team that Mr. Sheffield was whipping wheeled around to the right and jerked the log on me and broke my leg. I testified on the last trial of this case to this: 'After Mr. Sheffield went up and hitched the bunching team on, some one told me to catch all I could with my knot behind the wheel. Somebody said that just as they started to move the log again, just as the cart moved. It wasn't just before, but just as the cart moved. The cart had just started to move when they hollowed that.' They had tried to move and didn't move. I testified on the last trial of this case that somebody hollowed to me to take up my chock just as the cart moved. The cart doesn't move until after the log has been loaded out. If some one hollowed to me to take up that chock just as the cart moved, they didn't hollow that until after the cart had been loaded out. As to whether or not I testified truthfully on the last trial that it was just as the cart moved that they hollowed to me to take up my chock, will say, it didn't move far; it didn't get out of the hole. It didn't get out of the hole. They tried to pull and didn't get out of the hole.

"Q. I understand you to testify that they backed the cart team back there and jumped the cart entirely out of the hole while you were standing back at the back end of the log there? A. When I was told that, they didn't get out. Sheffield stopped them and had them to back up and latch the cart and jump it out of the hole. It was right about the time the cart had been jumped out of the hole that somebody said to me to take up my chock. That is what they wanted the knot up there for—was to keep the cart from going back in the hole. As to whether or not it was after the cart had been jumped out of the hole that somebody told me to take up my chock, will say, I moved up my knot several times. It was after the cart had been jumped out of the hole that somebody told me to take up my chock when I was standing back beyond the end of the log. It was not after the cart had been jumped out of the hole that I walked back to the back end and behind that log. I was back there when it was jumped out of the hole. I went back there before they had jumped the cart out of the hole; I thought I was through up there. I went back behind the end of the log. It was while I was standing back there behind the end of the log that the cart was jumped out of the hole. It was after the cart had been jumped out of the hole that somebody hollowed to me to take up my chock. As to whether or not I testified truthfully on the last trial of this case that it was just as the cart moved that I was told to take up my chock, will say, it was just as they undertook to move; they didn't move far. It was just as the cart moved forward a little. I don't suppose they moved over that far forward (indicating). That cart couldn't have moved forward unless that log had been loaded out. As to whether or not at the time somebody hollowed to me to take up my chock the log had been loaded out and they were pulling forward, will say, they were trying to pull forward, but didn't; Mr. Sheffield had them to back up. I was standing back behind the back end of the log when this cart was jumped out of the hole. Just as they undertook to go forward, somebody hollowed to me to take up my chock. I testified on the last trial that it was just as

the cart moved forward that I was told to take up my chock. They didn't move but a short distance. It was just as they started to move that somebody hollowed that to me. That was after the cart had been jumped out of the hole. The cart couldn't have moved forward unless the log was loaded out. When some one hollowed to me to take up my chock, the log had been loaded out, and they were trying to pull the log forward; but they didn't go. They undertook to pull it. The log had then been loaded out when somebody hollowed to me to take up my chock and they were trying to go forward with it; I was going to say that it was loaded out several times.

"I stated in my testimony the other day before I was injured I went from behind the cart wheel back beyond the end of the log, and that thereafter, upon Mr. Sheffield telling me to chock the wheel, I went back up and attempted to chock the wheel. After I went away from the wheel to the end of the log in order to be in what I thought to be a safer place, I went back there simply because I knew Mr. Sheffield was an experienced man, and I didn't believe he would put me where there was any danger.

"I did get out of that hole and go back there because I thought it was dangerous up there; I testified to that. That is the reason why I got out of that hole, and that is the reason why I went back to the back end of that log. As to whether or not I wouldn't have gone back in that hole if Mr. Sheffield hadn't told me to chock the wheel, will say, I thought I was through there. When I put that chock up behind that wheel, I thought that was all the chocking I had to do. As to whether or not I wouldn't have gone back up there if Mr. Sheffield hadn't told me to, will say, I had no business back there. I wouldn't have gone back up there if Mr. Sheffield hadn't told me to chock the wheel. When he told me to go back, I did not consider the fact whether it was dangerous or not. I didn't think Mr. Sheffield would put me where there was any danger. As to whether or not the thought came in my mind, now I am going up there because Mr. Sheffield wouldn't put me up there if there was any danger, will say, I didn't have time to think. I just decided in my mind that Mr. Sheffield wouldn't put me where there was any danger, because he was an experienced man. I did not stand there contemplating in my mind the question of danger; I wasn't thinking about the danger. As I walked up there, it just came into my mind that Mr. Sheffield wouldn't tell me to go up there if there was any danger. I didn't think Mr. Sheffield, being an experienced man, would tell me to go in a dangerous place. I was considering, in going up there, this question of danger. I was considering that question. As to whether or not but for the fact that Mr. Sheffield told me to go up there I would have relied upon my own knowledge of the danger and wouldn't have gone, will say, I wouldn't have had any business up there that I knew of. As to whether or not I was revolving in my mind in going up there the question of danger, will say, I wasn't thinking anything about the danger; I was just watching how they were going to get that log out of there. I just stated that as I walked up there the thought came into my mind that Mr. Sheffield wouldn't tell me to go up there if there was any danger. Probably the question of danger was revolving in my mind at that time. As to whether or not this is the attitude I was in: Here is a dangerous place, a tight place, but Mr. Sheffield wouldn't tell me to go up there if there was any danger, will say, the log was lying still at that time. I didn't see any danger because the log was still, and the cart was still when I walked up there. Probably I went right on and did what Mr. Sheffield said do without thinking about the danger. I expect the thought revolved in my mind that Mr. Sheffield wouldn't tell me to go up there if there was

danger, and I walked on up there. It is true that that thought was in my mind at the time. That is the thought that revolved in my mind at the time."

There was testimony by several different witnesses to the effect that appellee was inex-perienced as a grab setter, in the sense that he had never worked in that capacity prior to the day of his injury, and we find as a fact that he was so inexperienced. There was also testimony to the effect that appel-lant did not warn appellee of the danger at-tendant upon his attempt to chock the wheel of the cart at the time he received his injury, and we find as a fact that such warning was not given. In passing upon this assignment now under consideration, we deem it entirely unnecessary to discuss or mention the evi-dence of other witnesses, for the reason that none of it could have the effect to control or modify the effect that should be given to the entire evidence of appellee himself, as above set out.

[3] Now, let us concede that the evidence was sufficient to warrant a finding that appel-lant was guilty of negligence in any one or in all respects as claimed by appellee, still, can any candid and reasonable mind, after analyz-ing the evidence of appellee as a whole, reach a conclusion other than that appellee assumed the risk of danger which resulted in his in-jury? We think not. The undisputed evi-dence in this case is to the effect that appel-lee was a man of mature years and discre-tion; that he was accustomed to various kinds of manual labor; that he was familiar with many phases of sawmill work, and, in fact, was himself the owner of a sawmill at one time; that he was familiar with the driving and handling of teams, and he had done much of it in hauling loads of different kinds; that he had cleared new ground, roll-ed and piled logs, and had observed the handling of logs at and about sawmills, by means of cant hooks, etc., and, indeed, the record discloses that appellee's observation and general information along these lines ·could not be said to be at all limited. It is very true that he had had practically no experience in the particular business of grab setter, as hereinbefore explained; but, be-cause of this fact alone, we could not, in the face of his own testimony, and the entire rec-ord in this case, hold that appellant's defense of assumed risk was not made out, as a mat-ter of law. As we understand appellee's con-tention, it is, principally, that the danger to appellee arose when appellant's foreman, Sheffield, caused the bunching team to be hitched to the end of the log, rather than to the tongue of the cart, and in appellant's failure to place a check line on the bunching team, and in appellant's foreman's failure to then warn appellee of the danger that he (appellee) would be in in attempting to chock the wheel, and in ordering appellee to chock the wheel, under such circumstances, without such warning. In answer to this contention

of appellee, it is sufficient to say that his own evidence conclusively shows that he saw and observed the manner ·in which the bunching team was hitched to the log, before he was injured, and that he then saw and fully re-alized that the bunching team would prob-ably pull at an angle from the cart team, and that, if it did so, the log that the cart was handling would be caused to swing around in the direction of appellee, and that, if so, he would be in danger of being struck or in-jured by the log.

We say that these facts are absolutely ap-parent from appellee's own testimony, and that no candid mind can reach any other conclusion. But appellee contends that ap-pellant's foreman and vice principal was present, and, notwithstanding the danger that appellee would be in while attempting to chock the wheel under such circumstances, said foreman directed appellee to chock the wheel, and that appellee, in obedience to such command, attempted to do so, and that there-fore, having acted under the immediate di-rection of appellant's vice principal, appellee cannot be said, as matter of law, to have as-sumed the risk of danger which resulted in his injury. Much of appellee's brief is de-voted to this contention, and many author-ities are cited, nearly every one of which has been accessible to us and has been con-sidered, but none of them lay down the broad proposition that the mere presence and direc-tion of the master, in person or through another, will have the effect to deprive the master of the defense of assumed risk, where the employé attempts to comply with the command given and is injured, in such at-tempt, regardless of the knowledge on the part of the employé of the danger that would be attendant upon his attempt to comply with such command. We fully understand that line of decisions in this state which, in effect, hold that where the master is present, either in person or acting through another, and commands the employé to perform an act attended with danger, and the employé, on the spur of the moment and in obedience to such sudden command, responds and at-tempts to comply with such command, it will often be presumed that such employé, in so attempting, under such circumstances, to comply with such command, was not mindful, at the very time, of the danger attendant upon his attempt to do so, and applying such rule, employés have frequently been permit-ted to recover for injuries sustained, and our appellate courts have upheld such judg-ments. Some of these authorities are .cited by appellee, among which are: Galveston Oil Co. v. Thompson, 76 Tex. 235, 13 S. W. 60; Sherman v. Ry. Co., 99 Tex. 571, 91 S. W. 561; Waxahachie Oil Co. v. McLain, 27 Tex. Civ. App. 334, 66 S. W. 226; Lbr. Co. v. Kelley, 30 S. W. 696; Campbell v. Walker, 22 S. W. 823; Ry. Co. v. Reed, 32 S. W. 118; Turner v. McKinney, 182 S. W. 431; Ry. Co.

v. Eberhart, 40 S. W. 1060; Ry. Co. v. Eberheart, 91 Tex. 321, 43 S. W. 510; and, in this same connection other authorities from other states are cited.

This court does not deny or question the correctness of the rule announced in these decisions, but approves the same as being sound and just, and, when the facts of a given case warrant the application of this rule, this court will not hesitate to apply it. Some of these authorities deal with the failure of the master to warn a minor of dangers, etc., of his employment, and in directing a minor, without warning, to perform acts attended with danger, etc.; but some of them have reference to adults also. These decisions cannot control or have application here, for the reason that it is absolutely manifest, from appellee's own testimony, that at the very time he attempted to chock the wheel, which attempt resulted in his injury, he knew that his attempt to do so was attended with danger, and knew the character of the danger; but, notwithstanding such knowledge of the danger at the very moment in question, he attempted to comply with the direction of the foreman, Sheffield, and to chock the wheel, simply because Sheffield was the vice principal of appellant and had commanded him to do so.

[4] Now, we hold that since it is admitted by appellee, according to his testimony in this record, that at the very time he received his injury he was aware of the danger that was attendant upon his attempt to chock the wheel, and since he had this very danger in mind at the moment he attempted to do so, he cannot successfully contend that the command of Sheffield to chock the wheel, even if negligently given, would have the effect to relieve him of the defense of assumed risk. If the facts in this record were such that it might be reasonably inferred that appellee did not know of the danger that was attendant upon his attempt to comply with the command of appellant's foreman, at the time in question, or if the facts were such that it might be reasonably inferred that appellee did not have such danger in mind at the very time he attempted to comply with such command, then this court could hold, consistently with the rule above mentioned, and contended for by appellee, that the attempt of appellee to so comply with such command would not as a matter of law, prevent his recovery on the ground of assumed risk; but in view of the state of the record before us, and especially the positive testimony of appellee on this point, this court could not, consistently with any rule, hold that appellee did not assume the risk of danger which resulted in his injury. To do so would be, in effect, to deny to appellant the defense of assumed risk, which, at the time of the injury in question, was vouchsafed to it by the law of this state.

[5] As we understand, there is a vast difference between an adult of mature discretion, and a minor, when it comes to the question of the duty of the master to warn the employé. In the case of a minor, we understand the rule to be, as announced in this state that the master must, not only warn the minor that the occupation is attended with danger, but must go further, and explain to the minor the nature of the danger, and also how to avoid the same; whereas, in the case of the adult of mature years, the master, where the danger is not understood or appreciated by the employé is only required to warn such employé of the danger attendant upon the occupation, but is not required to explain, in the case of an adult, the details of the danger, and how to avoid the same especially where the character of the danger is such as to be readily understood and appreciated by such employé. In neither instance, however, will the master be held liable where the danger of the employment is known and fully appreciated, even though the master fails to give any warning whatever. And it being undisputed in this case that appellee knew and fully appreciated the danger attendant upon his attempt to chock the wheel, there was no necessity for warning by appellant, through its foreman, or otherwise; and the act of appellant's foreman in commanding or directing appellee to proceed to chock the wheel, under such circumstances, with such knowledge and appreciation of danger then present in appellee's mind, would not have the effect to relieve appellee of the defense of assumed risk.

We cannot, in view of the length to which this opinion has been already carried, discuss in detail the authorities sustaining our conclusion in this case, or even those cited by appellant; but the following, we think, sustain the conclusion we have reached and clearly announce the principle that we have attempted to apply: Ry. Co. v. Lempe, 59 Tex. 19; Ry. Co. v. French, 86 Tex. 96, 23 S. W. 642; Ry. Co. v. Somers, 71 Tex. 700, 9 S. W. 741; Green v. Cross, 79 Tex. 130, 15 S. W. 220; Ry. Co. v. Williams, 72 Tex. 159, 12 S. W. 172; Ry. Co. v. Hynson, 101 Tex. 543, 109 S. W. 929; Jones v. Ry. Co., 11 Tex. Civ. App. 39, 31 S. W. 706; Ely v. Ry. Co., 15 Tex. Civ. App. 511, 40 S. W. 174; Ry. Co. v. Martin, 21 Tex. Civ. App. 207, 51 S. W. 641; Cotton Oil Co. v. Shaw, 27 Tex. Civ. App. 65, 65 S. W. 693; Ry. Co. v. Scott, 62 S. W. 1077; Ry. Co. v. Austin, 72 S. W. 212; Ry. Co. v. Smith, 37 Tex. Civ. App. 188, 83 S. W. 719; Pipe Co. v. Noll, 37 Tex. Civ. App. 269, 83 S. W. 900; Refining Co. v. Simms, 168 S. W. 379; Brewing Co. v. Pisch, 33 Tex. Civ. App. 684, 77 S. W. 1047; Day v. Ry. Co., 46 Tex. Civ. App. 156, 101 S. W. 1044; Cronin v. Mfg. Co., 75 N. H. 319, 74 Atl. 180, 29 L. R. A. (N. S.) 111; Fontaine v. Lumber Co., 76 N. H. 163, 80 Atl. 338; Labatt on Master & Servant, vol. 3, § 1191.

[6] In view of our conclusion that the judgment must be reversed on account of the failure of the court to give the peremptory

instruction requested by appellant, for the reason that the undisputed evidence shows, as matter of law, that appellee assumed the risk which resulted in his injury it is unnecessary to discuss any of the other assignments made by appellant. And since it is apparent to this court that the case was fully developed in the trial court, and that there is no reasonable probability apparent from the record that appellee could made out a case of liability against appellant on another trial, it becomes the duty of this court to here reverse the judgment in favor of appellee, and to render judgment in favor of appellant, and it is so ordered.

Reversed and rendered.